v. Villalobos, 14-40147. And we'll hear from Ms. Keller. Were you the trial counsel? No, your honor. I'm the appellate counsel only. May it please the court. My name is Kim Keller and I am here today on behalf of Armando Villalobos. Mr. Villalobos was the district attorney for Cameron County from 2005 to 2012. He was convicted of participating in a racketeering scheme involving bribery and extortion and sentenced after a downward departure to 156 months in prison. Mr. Villalobos is here today asking for a new trial. The second issue raised in the brief related to a condition of supervised release I believe has been agreed to by the government and so I won't even discuss that issue. I will move right into the first issue raised in the brief which is Mr. Villalobos's complaint of misconduct by the jury foreperson. Here's what we know for sure. The juror foreperson throughout the brief is referred to as juror 18. We were told by the district court to not use the individual's name throughout the briefing or any communication with the court. Was there a reason for that? I believe it was to protect the privacy of the juror. I know that during some of the things that developed during the investigation afterward revealed that there was a reporter supposedly making statements on behalf of the juror foreperson. The juror foreperson took offense at that and then sought out another reporter to clear up what he said were lies that were said about him. So I believe it might have been done to protect the privacy of the foreperson. So protecting the privacy of the person who's out on Facebook? I agree your honor and not only out on Facebook but talking to reporters about instances that he believed he was misquoted on or misspoken on. Now here's what we know for sure. If juror 18 had said during Vore Dyer what he said in his juror excuse form he would have been struck for cause. We know that by comparing what he said in his juror excuse form which was I am very and so how did he do this? Let's just I want to make sure we appreciate the the the importance of him making these statements because he visited the official district court website. He logged into the website using his juror ID number. He then asked to be excused from jury duty and when asked for the reason for that he said I am very pro-law enforcement. I even could not and this is where the most important part comes in. If law enforcement agents arrest a person it's because they are all caps are guilty of the crime. I have zero tolerance for criminals. That's what he told the district court and that's what he said is why he should be excused from juror duty. When we look at the challenges for cause that were granted by the trial court as to other individuals we see that the language used by those individuals was not as emphatic was not as strong with regard to a bias in favor of the government. The the record reflects in this case that the district clerk reviewed the juror excuse form and checked off that that he or she believed that this juror should not be excused and then forwarded that information to the district court. So we know that that happened whether the district court actually read it and appreciated the content we don't know. We also know for sure that the parties were not made aware of this juror excuse form until the sentencing phase of the trial. So there was no way that the parties could have asked the court to inquire further or to specifically question juror 18. The record does not reflect the specifics of it. What we do know is that it was acknowledged by the district clerk. It was checked off that this should not be granted. It was then forwarded to the district court. So when we look at some of the other challenges for cause, juror number 25, for example, says I'm leaning towards the prosecution slightly. Challenge for cause was granted. There were other challenges for cause granted by other individuals. Page 25 of my brief is a chart of all of the challenges for cause that were granted and it provides all the record citations of the exact language that was used by the individual to trigger the challenge for cause. The district court was very liberal in granting challenges for cause in this case. And so what happens then? So jurors like juror number 25 and other jurors who express a slight tendency in favor of the government were struck. Juror number 18, who sat silently during Vore Dyer, became the foreperson of the jury. And if we look at what the juror foreperson ignored and refused to give a positive answer to, we see that he was specifically questioned about whether such a bias existed. For example, he was asked, is there anyone with difficulty presuming the defendant innocent? He didn't raise his hand to that. Is there anyone who is not going to hold the government to its burden of beyond a reasonable doubt? Didn't raise his hand to that. Anyone with a strong bias for the government witnesses more? No hand. Anyone automatically trusting witnesses because they're from law enforcement? No hand raised. Well, actually, we're pretty familiar with those questions because you laid them out all in your brief, but don't you have to show prejudice? Well, there's two prongs. The McDonough case is the case, it's a U.S. Supreme Court case that a juror failed to honestly answer a material question. The second prong is the prejudice prong, Your Honor, which is show that a correct response would result in a valid challenge for cause. I think that right there, when we compare what the district court granted. Yes, Your Honor. But what the district court found is that he did not fail to honestly answer the question when you put it in the whole context of what occurred. Yes, Your Honor. The district court did an investigation after the conviction, the verdict was handed down, brought the juror foreperson into the chambers and questioned him about first his Facebook post. And I pointed out the juror excuse form, but we also have to remember that wasn't the first time juror 18 espoused a pro-government bias. On the first day that he received his jury summons, he got onto Facebook and he posted, I got jury duty on my birthday. And a friend said, well, just tell him you're pro-government, you're pro-law enforcement. And spontaneously he responded, I am pro-government, I am pro-law enforcement. And so what we are asking this court to do today, we know that the district court asked the juror number 18 questions after this information came out. And we know that juror 18 gave excuses and said, well, I was lying then. I was lying. I wanted to get out of jury duty. As you know, we put a lot of confidence and dependence on the trial judge. And Judge Hannon is an excellent judge. He's had a lot of experience. There was nothing before the jury was selected that would raise any question about 18, is there? The juror excuse form, your honor. Well, the judge didn't see that, did he? Well, the record probably didn't. The record reflects that the juror excuse form was forwarded to the district court. So I think that does serve as evidence that the district court had it before him. I don't think you can went into this and interrogated, would not raise any issue known to the court, except maybe if he saw that file that was responded. Right? That's correct, your honor. The finger pointing here, your honor, today, though, is not at Judge Hannon. It's at the juror for failing to accurately answer those questions and denying Mr. Villalobos a chance to challenge him for cause. We agree that the trial court could have found to the contrary and that he was biased and failed to disclose. The fact that the trial court examined him and determined opposite, that he was lying and just trying to scheme to get out of jury duty. How can you overturn that as clearly wrongness? That is plausible that he could have been just trying to scheme to get out of jury duty, isn't it? Well, your honor, and Mr. Villalobos acknowledges that this is an abusive discretion standard. This is a difficult standard, but it is not insurmountable in this because we're asking, and we point the court to the Perkins case that we cited in our brief. The Perkins case has a similar scenario where you have repeated omissions in answering board ire questions by someone who ends up on the jury. And because of the repeated omissions and the equivocation by the individual, the 11th circuit in that case reversed the district court for believing the juror for a person. And what the 11th circuit said in that case is when you have spontaneous statements beforehand and you weigh those against post-conviction statements, so after the juror's been caught and is maybe a little more defensive, the spontaneous statements are actually more reliable and should carry more weight than those made after the fact when the juror may be trying to cover up something. The only thing that I could think of, your honor, is this was a relatively high-profile case. Mr. Villalobos was the district attorney for many years in this county, and I think at first the juror number 18, like a lot of folks in this country when they get a jury summons, but then when he learned of who this was and what this case was going to be about, perhaps then took an extra interest in the case and was more inclined, and especially the fact that Mr. Villalobos had been charged with the responsibility of prosecuting individuals and now is being accused of bribery and extortion. And it falls in line with that bias of here you've got someone who's been put in a trusted position to enforce the laws and he's now being accused of taking advantage of that position. Did the lawyers have a chance to submit questions that they wanted Judge Hayden to ask beforehand? Because I noticed that Judge Hayden did not ask about the statement that you mentioned here today, that people are guilty, which I think is the worst statement of all the statements in both the Facebook and the jury forum. They are guilty is the most probative of a bias, and he didn't particularly ask about that. Did y'all have a chance, not you personally, but the lawyers had a chance to ask Judge Hayden about what to examine the jury about? Well, and remember, that statement didn't come to light until sentencing. And so the lawyers... They didn't have a chance to ask? Yeah, they didn't even know... Did you ask to open it back up or any of that? Well, what happened, according to the record, and of course I wasn't there, but when I read the record, what I saw was trial counsel asked to subpoena the foreperson, asked to subpoena all of the jurors. What Judge Hayden did was he said, I'm going to do an in-camera investigation first, brought the juror in, and then made findings in his order, and did not allow trial counsel to participate in any of the examination. So it wasn't, he couldn't submit some questions or something? That's sometimes what's done when people go in camera, they say, well, we'd like you to wire about this and that. And that did happen during the regular voir dire, beforehand, once folks raised their hands. But I'm talking about during the in-camera review after the statements came to light. No, I don't... The record did not reflect that that happened. It was a request that there be an investigation. Judge Hayden did his investigation. What was filed in the middle, before, I think after the investigation happened, but before the transcript was filed of the investigation, was a request to participate in that and to be a part of that. How did these comments surface? It was, someone found them and filed, part of our trial defense team located these. How they were located, I don't remember. I don't even know what's in the record. Was it the defense team that located them, or some reporter who located them? I don't remember exactly the origin of how it was received, but I know that it triggered defense counsel to file a motion for new trial, based on the location of these faces. And then, how long a gap was there between when the jury verdict was returned and when, you say, it surfaced at sentencing? Before sentencing is when the motion for new trial was filed. Yes, Your Honor. Well, how long after the jury verdict came in? I've got the docket sheet here. I can look it up, Your Honor, the distinction between the jury verdict being handed down. I don't remember it off the top of my head. Well, sometimes it takes, with a public official like this, it takes a long time before the sentencing is done. It wasn't, in my recollection, it wasn't a lengthy period of time at all. Okay. And there's no question that this was an authentic document that was requested by the judge. Nobody's arguing that that's fraudulent or anything, right? No, Your Honor. In fact, in the transcript of the questioning by Judge Hainan of the juror number 18, he admitted to posting it. Yes. I mean, you knew, the defense knew the names of the jurors at trial, did they not? Yes. So they could have easily gone out and looked for Facebook posts while the trial was going on, couldn't they? They could have. However, I would like to point out, Your Honor, that— The judge told them not to. Well, I was going to say it was only after, in the interim of when the final judgment was handed down in this case, and when we were preparing our briefing for the appeal, that the ABA handed down its opinion permitting trial counsel to review the social media postings of potential jurors. So I don't know if it was actually authorized or even allowed ethically until that ABA opinion came down saying it is okay to go ahead and do that. Well, we know that it's a phenomenon, ABA or not. That's why I was asking. Yeah, what we do know now is since the final judgment was entered, the ABA has taken a stance and said it's authorized. Whether they were allowed to do that beforehand, I think, is a gray area. But would the defense counsel have had any way of getting the excuse information? That wouldn't have been something the defense counsel could have asked the court's office for— No. —for all the jurors. That wouldn't have ever been something they would have gotten. I really don't think so, Your Honor. And the only thing I can point you to in the record is the fact that, for sure, we know they did not receive it in this case until the sentencing phase. And whether they could have asked for it and gotten it— I have no idea how they received it in the sentencing phase. It just popped up. I think what may have happened is at the point of receiving the Facebook post, there may have been now saying, hmm, maybe we— The court would have had the records and— Correct. Correct. I mean, I think where we're— the road that we're going down here is really raising the burden on what defense counsel's job should have been when the voir dire process is in place for a reason. I apologize. So, Your Honor, I will finish on rebuttal. Thank you. All right. Good morning. May it please the court. I'd like— Have you encountered a juror Facebook post before? This is the first, Your Honor, to be quite candid. So, I think it's important to look at this in context because any time you have voir dire and a juror raises their hand, there's always follow-up questions to find out the context in which the juror makes the statement. And perhaps the juror is excluded. Perhaps the juror isn't, depending on those responses. In this case, in March of 2013— Well, there's not always follow-up. If you make a definitive statement, they would make you strikable for cause. That's not for sure. Then, usually, a lot of times, they leave that juror alone and then just mark it down. They don't want to open it back up for possible rehabilitation and all that sort of thing. And this would have been a definitive statement if they were strikable for cause, wouldn't it have been? Do you say, I think they're always guilty, in capital, all guilty? If it was—if the juror—I'd like to— If the juror, at voir dire, confirmed that that was, in fact, his opinion, yes, it would have been an excludable, challengeable statement right off the bat. So, what we have is we have statements that occur pre-voir dire, voir dire, and post-voir dire. So, in this case, if you look at the context, Juror 18 receives a summons, and he says he's got a conflict for the date of the summons. What he doesn't know, when he receives that summons, is that he's not really being called for jury duty. He's being called in to answer a questionnaire. The jury trial is a month later, after the day he comes in and fills out the questionnaire. He has no conflict a month later. Does he know whether it's a civil or criminal crime? Has no idea. Except for the fact that every citizen in Cameron County may know that the federal courts only do criminal cases. But they probably don't, don't they? They probably don't. So, he makes a post on Facebook, and one of his friends says, hey, if you want to get out of jury duty, this is how you do it. So, we already know from the context that he's attempting to avoid jury service. So, he makes this post, and then later on, he sends in two days before he's scheduled to appear to fill out the questionnaire. Of course, he doesn't know whether it's a criminal case. He doesn't know that he's not reporting for jury duty. He sends the judge, the court, the clerk, an email, and it does appear, according to the order, in all candor on page seven, that I believe the judge was aware and said, no, we're bringing him in because the judge felt that he was trying to avoid jury service, and that the judge has seen these sorts of ploys before. And so, they bring him in. He fills out his questionnaire. Now, up until that point, he's not under oath. The questionnaire, he signs under penalty of perjury. And at no point in the questionnaire, he abandons what he had previously said, in essence. So, it's a personal email. It's not an excused one, which is under oath in most counties. The excused one that you fill out normally is under oath. It may be. It was in the form of a letter, and the judge read the context, and so there was no indication, as far as I can tell from the record, whether there was a jurat on that or not. It's an email. It's an email. It's just an email. To the district clerk. Exactly. And what do you expect? I mean, that's not on the excused form, isn't it? I believe that it's a way to communicate to the clerk regarding a conflict or a reason why you won't. But don't they send out, I mean, all I'm familiar with is state jury duty, but that says you can make the following reasons why you can't serve. You have a child at home, you're bedridden or whatever. Yes. I assume the federal court does the same thing. I would assume. And what we do have in the record is where the judge conducts the in-camera hearing, where we specifically get to that portion. The judge says, it says, please give a detailed reason for your request. And then the judge says, that is probably the court's language. And then there's a colon, and then you wrote. And then he gave his excuse why he doesn't want to come. And of course, it's the, I can't be fair because I'm pro-law enforcement and because people are arrested. It is classic, you know, consistent with the Facebook post. It's classic. I don't want to serve language. And so what happens is he comes in, sits through Vore Dyer. He's never asked any specific question that he would have to answer. That if he was in fact telling the truth at Vore Dyer when he's under oath, then all what he said previously is essentially by context, we know. And what he said in the in-camera hearing, that in fact, he was being truthful. Appellant's arguments center on this whole idea that he was lying. What's interesting about appellant's brief, appellant never claims that the district court erred in its procedures in handling this case. Never says that they should have been told. There's no argument that the district court committed any error at all. They focus solely on the believability, the credibility of this juror. And that issue has been firmly resolved by the district court. And he really believed what he said he believed. He shouldn't have raised his hand, right? The question, actually, there was, if he answered honestly at Vore Dyer, there was nothing to raise his hand about. The judge, he could be fair. He believed that everybody's guilty. If he believed that, he should have spoken up. If he believed that, absolutely. And he didn't believe that. And we're clear about that because we know, it's not as if we just have his post verdict opinion, which the district court was clearly entitled to credit, by the way. But we also know from the context, from the Facebook post, that from the very beginning, this was about avoiding jury service. And once the date had passed, he didn't have a conflict anymore. I assume, well, it was his birthday. And there was some talk about a wedding as well. I assume that the judge gave some instruction to the lawyers after the case about whether or not to contact jurors. What was that? I don't recall that there was a specific instruction regarding whether they should or shouldn't contact jurors. I know that this motion came at some point following the verdict. I don't have those exact dates. But whether they were told or not told, they could contact the jurors. I'm assuming that that may have been given. There's no issue that anybody did anything wrong vis-a-vis the jurors at this point. Absolutely, Your Honor. And so I'd like to talk a little bit about the standard. And counsel talks about the Perkins case. And so if you look at McDonough, the Supreme Court case, that there's this idea of the concealment of an objective material fact. So that's where, are you related to law enforcement? And in fact, you are related to law enforcement. Have you had experiences with the legal system? And you have had a legal experience, that sort of thing. And so this court in a case called Robbins, which I cite in my brief, actually says that if it's not an objective material fact case, then the McDonough standard probably doesn't apply. And that we're back, really, to just straight abuse of discretion. And so in the Robbins case, we had a situation where a juror was a doctor who was dispensing sleeping pills and was being prosecuted. And this juror had a daughter who had became very, very ill as a result of the abuse of prescription medicines. The juror remained silent during Bordier. And then once was in the jury room, told the other jurors that, hey, I tricked them. I kept my mouth shut, didn't tell them. And my daughter had this horrible experience with prescription medication. And so the way this ends up being resolved is that the judge brought the juror in. The juror said, no, I didn't make that statement. Those other jurors are lying. And that, in fact, none of the claimed bias that they said I have, I have. And the judge said, OK. And this court said that the judge was entitled to credit the juror's denials of bias. And that's exactly what we have in this case. And so if the defendant had been truthful during Bordier, this case ends right there. OK. And your theory of why he was silent during Bordier is that he had nothing to say that was helpful, right? That he wanted to get off the jury. And your theory is he no longer wants to get off the jury because he doesn't have a specific date. My understanding of people who want to get off the jury, they don't usually care what day it is. They just want to get off the jury. And so that runs a little bit against your idea that he sat silent during Bordier. Well, the Facebook post says, I'm summoned and it's on my birthday, suggesting that there's a conflict. And he had some kind of, he either had a project or he was trying to rush through the jury service. There was a subsequent issue which was completely resolved. And by the way, it is completely clear that there were no contacts with the press during the trial. And that he friended on Facebook a reporter after the trial had ended and the jury had reached its verdict. So that issue is completely a non-starter. As to a comment he posted on Facebook on the last day of trial, or I think the day the jury reached its verdict, he said, I've got to get some stuff finished, in essence, is what it was. And the court explored that. And it related to his work. It did not relate. And the court found that it did not relate to his jury service. And so in this case, and so the interesting thing is that where you have an objective material fact, and you can look at it and say, you are related to the deputy sheriff, well, then you can say unequivocally that the juror lied. And the juror did remain silent during Bordier. But when you're talking about a subjectively held belief of bias, and the juror, and I believe in the Robbins case, they talk about a premature expression of bias, is how they refer to it, where you have this pre-Bordier expression of bias, which is then essentially repudiated, well, which version of it is the truth? And the judge is the one who gets to decide. The judge is the one who looks at the demeanor of the juror, weighs the credibility. And this is exactly the sort of thing that this court is fact-bound to leave in the district court's hands. It's interesting. There's a portion. Well, excuse me. Can you shed any light on how this Facebook posting surfaced? It is unclear from the record, Your Honor, how the defense learned of the Facebook post. There's nothing in the record that says how they learned. And I'm not accusing them of unethical conduct or anything. I'm just asking. Obviously, somebody was certain. You know, I thought maybe the reporter saw it. Maybe the defense counsel decided to scope out the jury post hoc to see if any misconduct had occurred. Something happened. Whether it was a reporter, whether it was an investigator, we're not sure. The record is silent from my, I've read the record. There's nothing that tells us how the defense learned of this. On page 41 of the brief, though, getting to my argument about this being a fact-bound decision that was clearly in the district court's hands, Appellant argues the spontaneous and unsolicited out-of-court statements made by Juror 18 before trial thus represent the best indicator of his true opinion's beliefs as opposed to statements made by him after he was accused of engaging misconduct. That is exactly the sort of credibility determination that is left to the district court to determine. This is a situation where we are left to essentially second guess what the district court conducted. By the way, there was no objection to the in-camera proceeding. That was agreed to by the parties. Everyone agreed that was perfectly acceptable. And if you read through the record, the judge was incredibly thorough. And it's very clear that based on the order, based on all the responses of the juror, that the juror had abandoned these statements that were made and said, no. When he said, I'm pro-law enforcement, he said, I'm pro-not lawlessness. And the judge gives an analogy. It would be like somebody saying, no one's pro-cancer. Is anybody really interested in lawlessness? Everybody's pro-law enforcement in the sense that they don't want their homes burglarized and they don't want their community savaged by crime. And that's what he says. He says, I have no ax to grind. He's very clear and very, very candid. Let me, how long did the jury take to return a verdict in the case? I think it was, there were a couple of notes and it may have taken place over a period of two days, I think, I think it was two days. I'd have to go back and look exactly. I do know there were some deliberation issues. And of course, we can't speculate and it's totally improper to try to get into the actual jury room process. But we do know there were a couple of notes and the jury continued to deliberate. And they did reach a verdict. And so in this case, I think the Collins case from this court and the Robbins case clearly demonstrate that this is the exact sort of discretionary ruling that the district court was entitled to make. There's no claim of error on the part of the district court on appeal. And for all these reasons, if there are no further questions, I'll yield back my time. All right, so thank you. Okay, Ms. Keller, rebuttal. The two cases I would ask this court to review and consider are the Perkins case, which is from the 11th circuit, where the appellate court reversed the district court for not granting a new trial and advised that believing the juror in that situation in the post-verdict investigation was an abuse of discretion. And that was based on the juror admitting to having lied back and forth on certain things. And then the Nell case from this court, N-E-L-L. And that gives this court, this court handed down the mandate that if there are any doubts as to a juror's bias, the doubts must be resolved against the juror. And that is to preserve an impartial, the right to an impartial jury in a criminal case. Here we have a biased Facebook post. We have blatant bias in the juror excuse. We have nothing being said in the juror questionnaire or during voir dire when specific questions were asked. We have the juror disregarding the court's instructions to not use Facebook and make postings. We have an admission during the in-camera hearing that the juror had lied on his juror excuse form, even if you want to believe him, that he was lying. And then we have a post in Facebook on the same day that the trial ended and the same day that the jurors finished deliberation, the post saying, let's see if I can finish this up today. So, and then we have him following a reporter after the fact. Repeated behaviors lying to the district court on its excuse form, if you want to believe the juror. Was that what the reporter he got mad at or the reporter he liked? He said he was mad at the one reporter, sought out a credible reporter and liked that one. He was mad at the other reporter for lying about him. But bottom line, there's clearly doubts about this juror. And this court in Nell has told us we must resolve those doubts against the juror. But you're not contending that the district court made an erroneous fact-finding? Yes, Your Honor. We're not disputing the district court's process. We agreed to that at the trial court. We are contending that the district court abused its discretion in believing this juror. Unless the court has any other questions, we simply ask the court for a new trial for Mr. Villalobos.